CLERKS OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED

FEB 16 2018

JULIA C. DUDLEY, CLERK
BY: s/ H. MCDONALD
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Danville Division

| | | |
|---|---|---|
| MARY ELLEN YATES, | ) | |
| Plaintiff, | ) | Civil Action No. 4:16-cv-00059 |
| | ) | |
| v. | ) | |
| | ) | REPORT & RECOMMENDATION |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | By:    Joel C. Hoppe |
| Defendant. | ) | United States Magistrate Judge |

Plaintiff Mary Ellen Yates asks this Court to review the Commissioner of Social Security's ("Commissioner") final decision denying her applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act (the "Act"), 42 U.S.C. §§ 401–434, 1381–1383f. The case is before me by referral under 28 U.S.C. § 636(b)(1)(B). ECF No. 12. Having considered the administrative record, the parties' briefs, and the applicable law, I cannot find that substantial evidence supports the Commissioner's final decision. Accordingly, I recommend that the decision be reversed and the case be remanded under the fourth sentence of 42 U.S.C. § 405(g) to give the Commissioner another opportunity to explain her findings and conclusions.

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final decision that a person is not entitled to disability benefits. 42 U.S.C. §§ 405(g), 1383(c)(3); *see also Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, a court reviewing the merits of the Commissioner's final decision asks only whether the Administrative Law Judge ("ALJ") applied the correct legal standards and whether

1

substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 98–100 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review takes into account the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (quoting *Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996)). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *accord* 20 C.F.R. §§ 404.1505(a), 416.905(a). Social Security ALJs follow a five-step process to determine whether a claimant is disabled. The ALJ asks, in sequence, whether the claimant (1) is working; (2) has a severe impairment that satisfies the Act's duration requirement; (3) has an impairment that meets or equals an impairment listed in the Act's

regulations; (4) can return to his or her past relevant work based on his or her residual functional

capacity; and, if not (5) whether he or she can perform other work. *See Heckler v. Campbell*, 461

U.S. 458, 460–62 (1983); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. §§

404.1520(a)(4), 416.920(a)(4). The claimant bears the burden of proof through step four. *Lewis*,

858 F.3d at 861. At step five, the burden shifts to the agency to prove that the claimant is not

disabled. *See id.*

## II. Procedural History

Yates filed for DIB and SSI on September 21, 2012, alleging disability because of post-

traumatic stress disorder ("PTSD"), borderline split personality disorder, anxiety, and depression.

*See* Administrative Record ("R.") 71, 84, ECF No. 9-1. She alleged disability as of December

31, 2008, at which time she was twenty-five years old. *Id.* Disability Determination Services

("DDS"), the state agency, twice rejected Yates's applications. R. 97–98, 124–25. On September

2, 2015, Yates appeared with counsel for an administrative hearing before ALJ H. Munday. R.

45. Yates and a vocational expert ("VE") testified at the hearing. R. 51–64, 65–69.

ALJ Munday issued an unfavorable decision on October 15, 2015. R. 16–33. She first

found that Yates had not worked since December 31, 2008, and that Yates met the Act's insured

status requirements through March 31, 2013.[1] R. 19. At step two, she found that Yates's

fibromyalgia, PTSD, major depressive disorder, and borderline personality disorder qualified as

"severe" medical impairments. *Id.* All of Yates's other diagnosed conditions were deemed non-

severe impairments.[2] *Id.* At step three, ALJ Munday found that none of Yates's severe

---

[1] To qualify for DIB, Yates "must prove that she became disabled prior to the expiration of her insured status." *Johnson*, 434 F.3d at 656; *see* 42 U.S.C. § 423(a)(1)(A), (c)(1)(B); 20 C.F.R. § 404.131 (2015). Yates's date last insured is not relevant to her claim for SSI. *See Redditt v. Colvin*, No. 7:13cv391, 2014 WL 2800820, at *4 n.3 (W.D. Va. June 18, 2014); 20 C.F.R. §§ 416.202, 416.501 (2015).

[2] ALJ Munday also found that Yates's alleged "arthritis of the knees" was not a medically determinable impairment because there was no medical evidence indicating Yates had been diagnosed with that

impairments met or medically equaled one of the impairments listed in the Act's regulations. R. 19–21. As part of this analysis, she also found Yates's mental impairments caused "mild restriction[s]" in her daily activities, "moderate difficulties" in social functioning, "moderate difficulties in concentration and persistence[,] and no significant limitation in pace." R. 20.

ALJ Munday next evaluated Yates's residual functional capacity ("RFC") based on all of her medical impairments. *See* R. 22–31. The ALJ determined that Yates could perform "medium work"[3] and "simple routine tasks involving no more than simple, short instructions and simple work-related decisions with few workplace changes" and "occasionally interact with the general public and co-workers," but she could not "work in close proximity to others (defined as no teamwork or interdependence required)." R. 21. This RFC ruled out Yates's return to her past work. R. 31–32. Finally, based on her RFC finding and the VE's testimony, ALJ Munday concluded that Yates was not disabled during the relevant period because she still could perform certain widely available "medium, unskilled" occupations such as packer, cleaner, and inspector/grader. R. 32–33. The Appeals Council denied Yates's request for review, R. 1–5, and this appeal followed.

### III. Discussion

Yates makes two overarching arguments on appeal. First, she argues that ALJ Munday ignored evidence of her diagnosed migraine headaches and joint hypermobility syndrome when evaluating the severity of her medical impairments at step two and "failed to consider" those conditions when assessing her physical RFC. *See* Pl.'s Br. 11–13, 17. This argument merits only

---

condition and X-rays of both knees taken in March 2013 showed no abnormality. R. 19 (citing R. 636). Yates does not challenge this finding on appeal. Pl.'s Br. 12, ECF No. 16.

[3] "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. §§ 404.1567(c), 416.967(c). The "full range of medium work requires standing or walking for a total of approximately 6 hours in an 8-hour workday" plus "frequent bending or stooping." R. 21.

a brief discussion because, as the Commissioner correctly points out, Yates does not suggest ALJ Munday overlooked any impairment-related functional limitations that might have changed the outcome in this case. *See id.* at 11–13; Def.'s Br. 12–13, ECF No. 19.

Second, Yates argues that ALJ Munday did not explain how her mental RFC determination—i.e., that Yates was limited to "simple routine tasks involving no more than simple, short instructions and simple work-related decisions with few workplace changes," occasional interaction with the general public and coworkers, and no jobs requiring teamwork or "interdependence"—reflected her step-three finding that Yates had moderate difficulties maintaining concentration and persistence. Pl.'s Br. 13, 15. The Commissioner responds that ALJ Munday explained how "she arrived at the specific concentration, persistence, or pace limitations constituting her RFC" determination, Def.'s Br. 18, and reasonably relied on medical opinions that Yates could perform simple, routine tasks despite her mental impairments. *See id.* at 15–17, 18–19. Yates has the better position on this issue. "Given the depth and ambivalence of the [current] record," however, I find that the Commissioner should have another opportunity to explain her findings and conclusions.[4] *Radford v. Colvin*, 734 F.3d 288, 296 (4th Cir. 2013).

A.    *Non-Severe Impairments*

At step two, the ALJ determines whether the claimant has a "severe" medically determinable physical or mental impairment or combination of impairments. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). An impairment or combination of impairments "is considered 'severe' if it significantly limits an individual's physical or mental abilities to do basic work activities." SSR 96-3p, 1996 WL 374181, at *1 (July 2, 1996). Conversely, an impairment or combination of impairments is "considered . . . 'not severe' only if it is a slight

---

[4] Accordingly, I will generally limit my discussion of the evidence relevant to Yates's concentration, persistence, or pace limitations, and I will not address her broader objections to ALJ Munday's evaluation of the record as a whole. *See* Pl.'s Br. 13–14, 15–17.

abnormality which has such a minimal effect on the individual," *Evans v. Heckler*, 734 F.2d

1012, 1014 (4th Cir. 1984) (emphasis omitted), that it does not meaningfully impair his or her

functional ability to perform basic work activities, SSR 96-3p, 1996 WL 374181, at *2. *See also*

*Felton-Miller v. Astrue*, 459 F. App'x 226, 229–30 (4th Cir. 2011) (per curiam) ("[M]edical

conditions alone do not entitle a claimant to disability benefits; '[t]here must be a showing of

related functional loss.'" (quoting *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986))).

"Basic work activities" are the "abilities and aptitudes necessary to do most jobs," such as

standing, walking, and lifting, or responding to other people, exercising judgment, and dealing

with normal workplace situations. 20 C.F.R. §§ 404.1521(b), 416.921(b) (2015).

 Yates asserts that ALJ Munday committed reversible error by "fail[ing] to assess" her

joint hypermobility syndrome and by never "mention[ing] the word 'migraine'" when evaluating

her physical impairments. Pl.'s Br. 12, 13. Critically, however, Yates does not identify any

specific error in ALJ Munday's finding that, with the exception of fibromyalgia, PTSD, major

depressive disorder, and borderline personality disorder, *all* of Yates's other diagnosed

conditions, "considered singly and in combination," were non-severe impairments at least in part

because they "did not result in any continuous . . . functional limitations" affecting her ability to

do basic work activities. *See* R. 19. For example, although Yates faults ALJ Munday for not

mentioning a July 30, 2015 comment by Jeffrey Potter, M.D., that Yates exhibited hypermobility

at the elbows, two finger joints, knees, and ankles, Pl.'s Br. 12 (citing R. 1095–99), she does not

identify any "related functional loss" that ALJ Munday supposedly overlooked, *Felton-Miller*,

459 F. App'x at 230; *Gross*, 785 F.2d at 1166. Nor does she identify any functional limitations

associated with the "complaints of migraines" that appear in the medical record. Pl.'s Br. 12–13.

"[T]here is no rigid requirement that the ALJ specifically refer to every piece of evidence in [her] decision" so long as it is clear the "decision was based on the entire record" and the ALJ's factual findings are supported by substantial evidence. *Reid v. Comm'r of Soc. Sec.*, 769 F.3d 861, 865 (4th Cir. 2014) (quoting *Dyer v. Barnhart*, 395 F.3d 1205, 1211 (11th Cir. 2005) (per curiam)). ALJ Munday's discussion of Yates's physical impairments satisfied these standards. Indeed, she cited Dr. Potter's essentially normal findings on the July 30 physical exam, as well as his recommendation that Yates manage her pain with medications and "regular physical activity," to help support her finding that Yates's muscle and joint pain was not as debilitating as alleged. R. 28 (citing R. 1094–95, 1097, 1099). She also mentioned that Dr. Potter's exam "findings were consistent with hypermobility syndrome and associated fibromyalgia," *id.*, and she explained why Yates's complaints of back and knee pain, combined with "limited" and "mild" abnormal findings on physical exams and X-rays, supported her finding that fibromyalgia reduced Yates's physical capacity to work even though a DDS physician opined she had "no severe physical impairment," R. 30 (citing R. 103, 115–16, 632, 668, 673). Thus, Yates has not shown that ALJ Munday either "ignored" her joint hypermobility syndrome, Pl.'s Br. 12, or overlooked evidence showing the impairment caused specific functional limitations that might have changed the outcome of her disability claim. *Reid*, 769 F.3d at 865; *see also Vitrano v. Colvin*, No. 6:14cv51, 2016 WL 1032888, at *2 (W.D. Va. Mar. 14, 2016) ("[A]ny error by the ALJ at step two is harmless if the ALJ considers the effects of all of [the claimant's] impairments in the subsequent steps.").

Although ALJ Munday did not mention that Yates sometimes reported migraine headaches or that her family physician Larry Smith, M.D., occasionally prescribed a "migraine prophylaxis," *see, e.g.*, R. 54, 622–24, 627–29, 643, she acknowledged that Yates reported

having headaches, R. 23, and stated that she considered "the entire record" before making her factual findings, R. 18. *See also* R. 22–23, 25 (citing R. 53–54, 358–60, 622–24, 627–29, 643). There is no indication that Yates ever attributed specific functional limitations to migraine headaches. R. 54, 622, 627, 643. On March 18, 2013, for example, she told Dr. Smith that she was "currently able to do activities of daily living without limitation" even though she suffered "intense" migraines marked by "some nausea" and "increased sensitivity to light and sound" two or three times a week. R. 622. She also said her migraines were "less frequent" on topiramate, *id.*, but Dr. Smith told her to stop taking that medication because she was pregnant, R. 624. Yates repeatedly denied suffering from headaches and visual disturbances after this date. R. 653 (Aug. 2013), 1074 (Feb. 2015), 1066 (Mar. 2015), 1057 (Apr. 2015), 1053 (May 2015), 1038 (June 2015). Considering Yates's infrequent report of migraines and the absence of evidence showing any related functional limitations, ALJ Munday's failure to specifically discuss this medical condition almost certainly would not have changed the outcome of her disability claim. *Cf. Felton-Miller*, 459 F. App'x at 229 ("Felton–Miller's sarcoidosis diagnosis, without more, does not establish that she suffers from any particular symptoms or limitations."). Nonetheless, should the case be remanded for further proceedings, as I recommend, the next ALJ's decision must make clear that he or she considered all of Yates's medically determinable impairments reflected in the record. *See* 20 C.F.R. §§ 404.1523, 404.1545, 416.923, 416.945; 96-3p, 1996 WL 374181, at *1–2.

B.    *Mental RFC Assessment*

Yates next challenges ALJ Munday's assessment of her RFC, particularly as it relates to her ability to pay attention and stay on task in the workplace. *See* Pl.'s Br. 13–17. A claimant's RFC represents her "maximum remaining ability to do sustained work activities in an ordinary

work setting on a regular and continuing basis"[5] despite her medical impairments. SSR 96-8p,
1996 WL 374184, at *2 (emphasis omitted) (July 2, 1996); *see* 20 C.F.R. §§ 404.1545, 416.945.
It is a factual finding "made by the Commissioner based on all the relevant evidence in the
[claimant's] record," *Felton-Miller*, 459 F. App'x at 230–31, and it must reflect the combined
functionally limiting effects of impairments that are supported by the medical evidence or the
claimant's credible symptoms, *see Mascio*, 780 F.3d at 640. The ALJ's RFC assessment must
"include a narrative discussion describing" how medical facts and nonmedical evidence
"support[] each conclusion," *Mascio*, 780 F.3d at 636, and explaining why she discounted any
"obviously probative" conflicting evidence, *Arnold v. Sec'y of Health, Educ. & Welfare*, 567
F.2d 258, 259 (4th Cir. 1977). The ALJ must also "build an accurate and logical bridge from the
evidence to [her] conclusion," *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016) (quoting
*Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)), that the claimant retains a certain ability to
sustain work-related activities, *Mascio*, 780 F.3d at 636–37. Meaningful judicial review rarely is
possible when the court is "left to guess about how the ALJ" reached that conclusion. *Mascio*,
780 F.3d at 638; *see also Bradley v. Berryhill*, No. 4:16cv26, 2017 WL 4707035, at *2–4 (W.D.
Va. Oct. 19, 2017).

  1.    *Summary of Relevant Evidence*

  Yates's medical records from the relevant time show that she was diagnosed with PTSD,
major depressive disorder, and borderline personality disorder secondary to a "significant
history" of severe childhood sexual and physical abuse. R. 646; *see also* R. 539–41, 543, 545–
46, 610–12, 631–33, 964. Her anxiety and depressive symptoms date back to her teenage years,

---

[5] "A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work
schedule." SSR 96-8p, 1996 WL 374184, at *2. "[T]he RFC assessment must include a discussion of the
individual's abilities on th[is] basis." *Id.*; *accord Mascio v. Colvin*, 780 F.3d 632, 637 (4th Cir. 2015)
("[A]lthough the ALJ concluded that Mascio can perform certain functions, he said nothing about
Mascio's ability to perform them for a full workday.").

R. 539, 581, 631, and during the relevant time were intermittently managed with counseling and
prescription medications such as Wellbutrin, Cymbalta, Valium, BuSpar, and Zyprexa, *see, e.g.*,
R. 537–38, 553, 592–95, 596–609, 624, 631, 939–47, 950, 953, 1008, 1036, 1064, 1072.

       *a.    Primary Providers*

On February 7, 2010, Yates established care with Cynthia Wallis-Hill, a licensed clinical
social worker at Saguaro Group Triumph ("Saguaro Group") in North Carolina. R. 581; *see* R.
23. Yates's symptoms included generalized anxiety, panic attacks around large groups of people,
irritability, fatigue, and a tendency to self isolate. R. 581, 590. She exhibited a flat affect on
examination, but her concentration/attention, memory, thought content, attitude, and perceptions
were within normal limits. R. 586–87. Ms. Wallis-Hill recommended counseling and medication
to manage Yates's "significant [PTSD] symptoms and low-level, persistent depression." R. 589–
90. Yates regularly attended counseling throughout 2010, and Ms. Wallis-Hill consistently noted
that she was "polite," "responsive," and "communicative" during their sessions. *See* R. 596–609.
On a few visits, Yates mentioned that she wanted to return to school, R. 596, 602, and was
"investigating part-time employment" or "possibly" participating in a job-training program
called Work First, R. 599, 603–04, 606.

On January 31, 2012, Yates saw psychiatrist Nathan Jackson, M.D., for medication
management. R. 950–52. She said Cymbalta 30 mg helped her depression, but Valium 2 mg did
not help her anxiety unless she took three pills. R. 950. When Dr. Jackson noted that Yates
should have run out of these medications in the four months since her last appointment, she said
that the clinic called in enough refills to last through this visit. *Id.* The pharmacy informed Dr.
Jackson that Yates filled the Valium prescription a few weeks prior, but that she had not filled
the Cymbalta prescription since May 2011. *Id.* Yates explained that she did not have $3.00 to

10

pay for Cymbalta and filled the Valium instead "because she thought she needed something for anxiety more than depression." *Id.* She told Dr. Jackson that she did not apply for Work First because she could not meet the hourly commitment while taking care of her children. R. 951. She also felt like "her mental health [was not] good enough to do so." *Id.* On examination, Dr. Jackson observed that Yates's face was "mostly expressionless w[ith] diminished motor movements" and she "seemed a little more depressed" than usual. *Id.* He renewed the Cymbalta prescription, but did not renew the "Valium or add a soporific" for Yates's residual symptoms. *Id.* Yates saw psychiatrist Barry Weed, M.D., for routine follow-up in March 2012. R. 953; *see* R. 544. She said Cymbalta 30 mg was "working well," but she still experienced traumatic flashbacks, a dysthymic mood, trouble sleeping, and low motivation. R. 953; *see* R. 544. She reported "difficulty caring for her children due to these symptoms" and was trying to apply for disability benefits. *Id.* Yates's mental-status examination was normal. R. 953. Dr. Weed did "not see evidence for current disability," but noted that he would double Yates's daily dose of Cymbalta to address her "ongoing depressive symptoms." R. 954. He also gave her a new prescription for Valium 5 mg. *See id.*

Yates reestablished care at Saguaro Group in February 2012 because "she need[ed] someone to talk to" about her depression and anxiety as well as her young son's oppositional behavior. R. 543; *see* R. 543–61. She reported trouble concentrating, traumatic flashbacks and intrusive recollections, and constantly feeling "on edge." R. 549. Yates exhibited a sad and flat affect on examination, but her concentration/attention, memory, thought content, attitude, and perceptions were within normal limits. R. 548. The provider recommended that Yates continue taking Cymbalta and attend counseling to help manage her anger and improve her coping skills. R. 553; *see* R. 560–61. Yates attended four sessions with a licensed clinical social worker before

being discharged on May 16, 2012. R. 568; *see* R. 592–95. Three of those sessions were devoted to educating Yates about her diagnoses and identifying treatment goals. R. 593, 594, 595. A May 30, 2012 progress note from Saguaro Group psychiatrist Mark Moffet, M.D., showed that Yates's mental-status examination was normal and her "depression [was] getting better" on the increased doses of Cymbalta and Valium. R. 610; *see also* R. 611, 616. Still, Yates reported poor concentration and forgetfulness, being "hypervigilant and easily startled," and "having dysphoric moods much of the time." R. 610, 615. Dr. Moffet refilled Yates's medications and encouraged her to continue with "individual psychotherapy and intensive in-home family therapy as dictated by" other providers. R. 616.

On February 24, 2013, Yates presented to Dr. Smith's clinic with depression and anxiety. R. 631. Symptoms included moderately severe trouble concentrating, excessive worry, insomnia, irritability, and loss of interest. *Id.* She explained that she "did fine" on Cymbalta 60 mg for the past three years, but had run out of pills several months earlier when she relocated from North Carolina to Virginia. R. 631. Yates was "cooperative" and not in acute distress during her visit with the physician's assistant. R. 632. Dr. Smith renewed her Valium prescription and gave her a fourteen-day supply of Cymbalta 30 mg. R. 633. Yates returned to Dr. Smith's clinic several times for routine healthcare in March, April, and August 2013. R. 619–29, 652–54, 659–62. On March 18, she reported that her anxiety was "improving" on medication and she was "able to do activities of daily living without limitations." R. 622. Dr. Smith instructed her to stop taking Valium because she was pregnant. R. 624. Yates did not report any psychological symptoms on March 22, April 5, or August 3, 2013. *See* R. 619–21, 652–54, 659–60.

On October 10, 2013, Yates established services with Life Support, LLC, because she was struggling to regulate her emotions and provide a suitable home environment for her four

young children. R. 939, 945. Child Protective Services had removed the children from Yates's

custody "on more than one occasion" by this point, and Yates was pregnant with her fifth child.

R. 943. The Life Support team established a plan for a qualified mental health paraprofessional

to meet with Yates in her home for up to nine hours each week to work on parenting skills,

budgeting, completing basic activities of daily living, managing her emotions and

communicating effectively with family, and reducing her social isolation. R. 939–47. Progress

notes from these visits, which occurred every few days between June 19, 2014, and November

29, 2014, consistently reflect that Yates was either unwilling or unable to facilitate appropriate,

positive interactions with her children and fiancé. *See, e.g.*, R. 699–701, 702–04, 710–12, 719–

21, 723, 728–30, 906. She was receptive to most counseling, but she repeatedly balked at

suggestions that she look for housing in the city and generally resisted efforts to help her access

community services. *See, e.g.*, R. 703, 711, 714, 723, 767, 825. Yates's mood, as well as her

ability to care for herself and her home, also deteriorated as the months (and her pregnancy)

progressed. On July 17, for example, Yates was still wearing sleepwear and had not groomed her

hair when the provider arrived around 3:00 p.m. R. 874. On September 23, Yates "was in a

screaming mood" and "her 3 older children appeared out of control." R. 766. Staff noted a

similar scene on October 24 when the "house was in shambles" and Yates was neither groomed

nor dressed at 5:00 p.m. R. 728. Yates was "raging at her children" and the "house was in an

uproar" when staff arrived on the afternoon of November 17. R. 699 (spelling corrected). Her

mood improved considerably after the baby was born a few days later. *See, e.g.*, R. 685 (Yates

was dressed, "groomed, and appeared to be in a good mood," but her "house was not clean [or]

in order" on November 29, 2014).

In mid-November 2014, Life Support staff referred Yates to Destini Therapeutic Services ("DTS") for counseling, basic skill building, and medication management. R. 967, 989, 1001–05, 1010–11, 1064. On examination, the DTS provider observed that Yates had a flat affect with some psychomotor retardation; appeared depressed, "angry/hostile," anxious, and irritable; exhibited "loose associations" and "little" insight; and betrayed "impaired" concentration, attention, and memory. R. 993–95. In February 2015, a DTS provider opined that Yates had "moderate" to "moderately severe" problems maintaining a clean home and dressing in clean, appropriate clothing. R. 1023. A July 2015 note from Yates's counselor reflects that she still needed "a great deal of support" to meet treatment goals related to "communication skill development, stress management, and coping skills training." R. 1008.

Yates returned to Dr. Smith's clinic on February 10, 2015, to recheck her anti-anxiety medications and for other routine healthcare. R. 1072. She reported that Cymbalta and Valium were "working well" and provided "good symptom control" without adverse side effects. *Id.* Dr. Smith instructed her to continue these medications. Yates visited Dr. Smith's clinic about once a month between March and June 2015. R. 1036–41, 1051–54, 1055–61, 1064–67. Detailed mental-status examinations were within normal limits in March and April, R. 1059, 1067, and mostly within normal limits in May and June, R. 1039, 1054. On May 8, Yates appeared "anxious" as she explained that her children had been removed from her custody since her last visit. R. 1051. She also reported increased generalized anxiety and occasional difficulty concentrating, excessive worrying, and panic attacks. *Id.* At her next visit on June 9, Yates told Dr. Smith's assistant that "adding BuSpar to [her] existing medications ha[d] helped a lot" in reducing her symptoms. R. 1036. She still reported "daily" episodes marked by "moderate" anxiety, excessive worry, and nervousness. *Id.*

14

b.    *Examining & Reviewing Sources*

On February 4, 2010, Yates had a consultative psychological examination with Carol Gibbs, M.D., in connection with DIB and SSI applications Yates filed in September 2009.[6] R. 539–41; *see* R. 85, 100. She noted that she left her most recent job in 2008 when she discovered she was pregnant. Yates's thought process was linear, relevant, and coherent, and she exhibited good eye contact and normal psychomotor activity throughout the evaluation. R. 539; *see also* R. 540–41. She described "some avoidant behavior" consistent with dysthymia and "hyperarousal symptoms and intrusive thoughts" consistent with PTSD. R. 541. Dr. Gibbs opined that Yates "should be capable of understanding simple, repetitive instructions and tasks," but would have "mild-to-moderate impairment" completing complex instructions or tasks. *Id.* Her ability to deal effectively with work pressures and to respond to other people in a work environment would also be "mildly to moderately impaired." *Id.* Dr. Gibbs did not express an opinion about Yates's ability to maintain attention/concentration or to perform simple, repetitive tasks on a sustained basis. *See id.*

Yates also attended a consultative psychological examination with Christopher Cousins, Ph.D., on April 22, 2013. R. 641. She was cooperative and answered Dr. Cousins's questions without suspicion, hostility, or evasiveness. *Id.* Dr. Cousins observed that Yates betrayed a sad mood, restricted affect, and primarily blank expression. *Id.* She also "became tearful on a few occasions," *id.*, especially when recounting her "significant history of severe childhood sexual abuse," R. 646. Yates had recently stopped taking all prescription medications because she was pregnant. R. 645. On examination, Dr. Cousins observed that Yates's "thought content was logical, coherent, and organized"; her "associations were tight"; her abstract thinking was fair to good; her judgment and common sense reasoning ability were fair; and her immediate, recent,

---

[6] It appears that Yates abandoned these applications after DDS denied them in March 2010. R. 85, 100.

and remote memory were fair. R. 644. He opined that Yates "appear[ed] capable of performing simple and repetitive tasks" and would not need "special instructions or additional supervision" when working. R. 646–47. "Due to her PTSD and depression," however, she "would likely be unable to maintain regular attendance in the workplace, perform work activities on a consistent basis, and complete a normal work day or work week without interruption." *Id.* She appeared "capable of accepting instructions from a supervisor," but "would possibly have some trouble interacting with co-workers and the public." R. 647. Finally, Dr. Cousins "expected that [Yates] would experience significant difficulty coping with the typical stresses encountered in competitive work." *Id.*

On April 24, 2013, Howard Leizer, Ph.D., reviewed Yates's records as part of a consultative examination for the state DDS. R. 71–82, 84–95. He opined that her diagnosed affective disorder and anxiety disorder were "severe" medical impairments that caused "moderate" restrictions in her daily activities, "moderate" difficulties with social functioning, and "marked" difficulties maintaining concentration, persistence, or pace. R. 77, 90. Dr. Leizer also completed an RFC assessment giving his opinions of how Yates's overall moderate-to-marked limitations would affect her mental ability to perform or sustain specific activities in a competitive workplace. R. 78–80, 91–93. He opined that she was "markedly limited" in her ability to execute detailed instructions; "moderately limited" in her abilities to maintain attention and concentration for extended periods, perform activities within a schedule, complete a normal workday and workweek without interruptions, perform at a consistent pace without unreasonable breaks, and work with or near other people without being distracted by them; and "not significantly limited" in her abilities to make simple work-related decisions or sustain an ordinary routine without special supervision. R. 78–80, 92–93. He found "no objective evidence

to indicate" Yates would "be unable to maintain regular attendance . . . or cope with the typical stresses of competitive work." R. 80, 93. Ultimately, Dr. Leizer concluded that Yates "could most likely perform [simple repetitive tasks] on a consistent basis and would likely perform better in work situations" requiring "limited" interaction with the public and coworkers. R. 76, 89; *see also* R. 79–80, 92–93.

On November 27, 2013, Stonsa Insinna, Ph.D., conducted a reconsideration review of Yates's records for the state DDS. R. 99–108, 111–20. She found that Yates's severe anxiety and affective disorders caused "mild" restrictions in her daily activities, "moderate" difficulties with social functioning, and "moderate" difficulties maintaining concentration, persistence, or pace. R. 104, 117. Dr. Insinna concurred with Dr. Leizer's opinions that Yates was "moderately limited" in her abilities to maintain attention and concentration for extended periods, perform activities within a schedule, complete a normal workday and workweek without interruptions, perform at a consistent pace without unreasonable breaks, and work with or near other people without being distracted by them. R. 106–07, 119. She also concluded that Yates could perform "one- or two-step gainful tasks" despite her mental impairments. R. 108, 120. Unlike Dr. Leizer, however, Dr. Insinna did not express an opinion about Yates's ability to perform such tasks "on a consistent basis," R. 79, 92. *See* R. 107–08, 119–20.

Yates underwent a court-ordered psychological evaluation on June 10, 2015. *See* R. 956–66. Two months earlier, all five of Yates's minor children had been removed from her and her husband's custody "due to concerns about lack of supervision by both parents," sexual contact between the older children, and allegations that Mr. Yates had physically abused Yates's ten-year-old daughter. R. 961; *see also* R. 1014. Michele Nelson, Ph.D., observed that Yates was "polite" and "cooperative" during the evaluation, although she occasionally became irritable, R.

957, especially when discussing the custody case. *See* R. 964–65. Yates's "attention, concentration, and intelligence were sufficient for meaningful participation in the interview process." R. 957. Based on her evaluation, Dr. Nelson opined that Yates had "a primitive personality style, primitive interpersonal skills, and very limited coping skills. She appear[ed] easily irritated, defensive, and not especially open to considering feedback with which she disagreed," all traits Dr. Nelson considered consistent with a borderline personality disorder. R. 965. She also noted that Yates needed continued psychiatric treatment for "significant mental health issues and personality issues that impact[ed] her daily functioning, including her ability to regulate her emotions and impulses and to accurately understand interpersonal relationships and social cues." *Id.* "If the children [were] returned to the home," Dr. Nelson concluded, "intensive supervision and assistance will be needed to help [Yates] make the sort of fundamental changes that will provide her children with appropriate supervision, safety, and nurturance." R. 966.

        *c.*    *Yates's Statements & Testimony*

     In August 2013, Yates submitted an Adult Function Report describing how her medical conditions affected her functional abilities and daily activities. R. 267–74. On a typical day, Yates cooked for her three school-aged children, bathed and dressed her youngest child, washed laundry, or cleaned her trailer-home. R. 267–69. Physical pain and/or memory and concentration issues often prevented her from completing these tasks. R. 267, 272. Yates had no trouble caring for herself, but needed to set alarms so that she would not miss doctors' appointments or forget to take her medications. R. 268–69, 271. She could drive and occasionally shop in stores, but could not go out alone because she was hypervigilant and had panic attacks in public. *See* R. 270. She liked to read, watch television, and spend time with her children, but she otherwise tended to stay to herself and had very few friends. R. 271–72. Yates estimated that she could pay attention

for up to thirty minutes at a time and said that she struggled to remember or understand "some things" unless they were "explained in detail." R. 272. She followed written and spoken instructions well, but did not handle stress or changes in her routine "well at all." R. 273.

At the administrative hearing in September 2015, Yates testified that she stopped working in 2008 at least in part because "a lot" of times, "probably . . . three times a week," she spontaneously started crying on the job. R. 53; *see also* R. 62 (confirming that she quit her last job when she got pregnant). She was not taking any psychotropic medications in September 2015 because she lost Medicaid coverage when her children were removed from her custody several months earlier. R. 54, 59. Prescription mood stabilizers and anti-anxiety medications had reduced her PTSD and depressive symptoms in the past, but she did not think these medications provided enough relief to allow her to maintain a job. R. 55, 62. She admitted applying for waitressing and cashier jobs in January 2012 even though she knew working would "stress [her] out too much." R. 61–62. Yates's typical daily activities now included driving her husband to work, visiting her children in foster care, cleaning her trailer-home "a little bit" at a time if necessary, and going grocery shopping. R. 58–60.

2.    *The ALJ's Decision*

ALJ Munday discussed Yates's mental impairments throughout her written decision. At step two, she found that Yates's PTSD, major depressive disorder, and borderline personality disorder were severe medical impairments. R. 19. At step three, she found these impairments caused "mild restriction[s]" in Yates's daily activities, "moderate difficulties" in her social functioning, "moderate difficulties" in maintaining concentration and persistence, and "no significant limitation in pace." R. 20. She explained her mixed findings as to concentration, persistence, or pace primarily by noting that Yates

said in her function report that she did not need reminders to manage her personal care needs, but that she needed to set alarms for reminders on her phone for medication and doctor appointments, she said her hobbies included reading, watching television, and spending time with her kids, which she said she did "OK," she said that she needed things to be explained in detail, that she could pay attention for 30 minutes at a time, did not finish what she started, followed written and spoken instructions well, and did not handle stress or changes in routine well.

R. 20–21 (citing R. 267–74). ALJ Munday also discounted Dr. Leizer's opinion that Yates had moderate-to-marked limitations overall, R. 77, 90, because evidence that she "cared for 3 children, did household cleaning, drove . . . her husband to work every day, and drove to the grocery store and to visit her children" suggested Yates was "not as limited" as Dr. Leizer's assessment indicated. *See* R. 29–30. ALJ Munday gave "greater weight" to Dr. Insinna's opinion that Yates had mild-to-moderate limitations overall, R. 104, 117, because it was "balanced and generally supported by evidence of routine and conservative treatment with improvement of [Yates's] symptoms with medication and limited findings on mental status examination[s]," R. 30 (citing R. 549, 614, 685, 688, 691, 699, 953, 1059, 1067).

ALJ Munday then summarized and weighed much of the record evidence related to Yates's mental impairments and alleged functional limitations, including psychiatric treatment and examination notes, counseling and home-visit records, some of the medical-source opinions, and Yates's statements both to her providers and to the state agency. R. 22–31. She explained that Yates's testimony describing essentially disabling PTSD and depression, *see* R. 22, 28–29, was "not entirely credible" compared to evidence that routine counseling and medications "worked well to help relieve" her psychological symptoms; findings on mental-status exams showed mixed "mood and affect"; Yates "left most, if not all, jobs" for reasons unrelated to her mental health; and her "broad range of normal daily activities" showed she cared "for 3 children and manag[ed] money without difficulty and independently," drove her husband to work every day, visited her children in foster care, and cleaned her house a little bit at a time, R. 28–29

20

(citations omitted). ALJ Munday articulated the same reasons in crediting the medical opinions that Yates could do "simple, routine tasks" with some restrictions on social interaction, R. 29–30, and in rejecting Dr. Cousins's "opinion stating that [Yates] would be unable to maintain attendance [or] cope with typical stressors of competitive work," R. 30. She did not mention Dr. Nelson's medical opinions or the two DDS psychologists' RFC findings that Yates was "moderately limited" in her abilities to maintain attention and concentration for extended periods, complete tasks within a schedule, and perform at a consistent pace without unreasonable breaks. R. 27, 29–31.

Ultimately, ALJ Munday found that Yates could "perform simple routine tasks involving no more than simple, short instructions and simple work-related decisions with few workplace changes" and "occasionally interact with the general public and co-workers," but could not "work in close proximity to others (defined as no teamwork or interdependence required)." R. 21. Her RFC finding was "based on the medical evidence showing routine treatment and limited abnormalities," Dr. Gibbs's similar assessment from February 2010, and Dr. Weed's comment that he did "not see any evidence for current disability" in March 2012. R. 31. As further support for her determination that Yates could perform a range of medium work, ALJ Munday explained, "the medical evidence of record does not support a finding that [Yates] would be unable to sustain work on a consistent basis, particularly given evidence of [her] routine treatment, no evidence of psychiatric inpatient hospitalization, limited abnormalities on clinical examination and diagnostic study [sic], and broad range of normal daily activities." R. 33 (citing R. 267–74, 486, 629, 641, 685, 699, 949, 1049).

   *3.    Analysis*

Yates's objection to ALJ Munday's mental RFC and findings as to concentration, persistence, or pace invokes the Fourth Circuit's decision in *Mascio v. Colvin*, which, among other things, clarified the ALJ's duty to explain how a step-three finding that a claimant has "moderate limitation in concentration, persistence, or pace" either does or "does not translate into a limitation in [the claimant's] residual functional capacity." 780 F.3d at 638; *see* Pl.'s Br. 15. In that case, the ALJ found Mascio had "moderate difficulties in maintaining her concentration, persistence, or pace," but his subsequent RFC determination merely limited her to "unskilled work." *Mascio*, 780 F.3d at 638. And, although the ALJ's hypothetical question to the VE "said nothing about Mascio's mental limitations," he ultimately relied on the VE's testimony identifying certain "unskilled" occupations in concluding at step five that Mascio was not disabled. *Id.* at 637–38 ("The ALJ's hypothetical, together with the [VE's] unsolicited addition of 'unskilled work,' matched the ALJ's finding regarding Mascio's residual functional capacity."). The Fourth Circuit reversed the Commissioner's decision and remanded the case for the ALJ to explain why Mascio's "moderate" difficulties maintaining concentration, persistence, or pace did not translate into a limitation in her RFC—i.e., her maximum remaining *ability to sustain* work-related activities on a regular and continuing basis. *See id.* In doing so, the panel explained "that an ALJ does not account 'for a claimant's limitations in concentration, persistence, and pace by restricting the [RFC and] hypothetical question to simple, routine tasks or unskilled work'" because "the ability to perform simple tasks differs from the ability to stay on task." *Id.* at 638 (quoting *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1180 (11th Cir. 2011)). "Only the latter limitation [will] account for a claimant's limitation in concentration, persistence, or pace." *Id.*

ALJ Munday found at step three that Yates's mental impairments caused "moderate" limitations in maintaining concentration and persistence, R. 20, but in assessing Yates's RFC, she found that Yates retained the ability to "perform simple routine tasks involving no more than simple, short instructions and simple work-related decisions with few work place changes" so long as Yates had certain restrictions on social interaction. R. 21; *see* R. 29–31. ALJ Munday then relied on the VE's response to a hypothetical question propounding the same RFC in concluding at step five that Yates was not disabled because she could perform certain "unskilled" occupations. R. 32–33; *see* R. 67–68. Additionally, although ALJ Munday "said nothing about" Yates's ability to perform simple routine tasks "for a full workday," *Mascio*, 780 F.3d at 637, she did conclude that "the medical evidence of record does not support a finding that [Yates] would be unable to sustain work on a consistent basis," R. 33. She also "cited evidence that [s]he appeared to believe" supported this conclusion, *Monroe*, 826 F.3d at 189, such as Yates's daily activities, R. 267–74; Dr. Cousins's observations that Yates exhibited a sad mood, restricted affect, primarily blank facial expression, and good eye contact during the April 2013 psychological evaluation, R. 641; the mostly normal findings on physical examinations and X-rays of her knees and spine, R. 486, 629, 949, 1049; Life Support progress notes from two home visits in November 2014, R. 685, 699; and "no evidence of psychiatric inpatient hospitalization," R. 33.

The problem, however, is that ALJ Munday's written decision did not squarely address Yates's ability to maintain the attention or mental stamina needed to perform simple, routine tasks on a sustained basis despite having also found Yates had "moderate" difficulties maintaining concentration and persistence. R. 20, 29–31, 32–33. The latter finding necessarily establishes some degree of impairment in Yates's "ability to sustain focused attention and

concentration" long enough "to permit the timely and appropriate completion of tasks commonly found in work settings." 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.00(C)(3) (2015); *see Petty v. Colvin*, 204 F. Supp. 3d 196, 206 (D.D.C. 2016). Thus, in order for this Court to meaningfully review the Commissioner's final decision, ALJ Munday's narrative discussion must adequately explain either how her RFC finding reasonably accounts for Yates's "moderate" limitations maintaining concentration and persistence, or why, notwithstanding the ALJ's step-three finding, Yates's limitations "do not affect" her capacity to sustain "simple, routine, or unskilled work." *Perdue v. Colvin*, No. 7:14cv173, 2015 WL 5771813, at *6 (W.D. Va. Sept. 30, 2015) (rejecting the argument that an RFC for "simple, routine, or unskilled work" necessarily accommodates "moderate" limitations maintaining concentration, persistence, or pace, and concluding that the ALJ must explain "in relation to the medical record" any finding that such limitations "do not affect the claimant's capacity for simple, routine, or unskilled work"); *see Sellers v. Colvin*, No. 4:15cv38, 2017 WL 599423, at *14 (W.D. Va. Jan. 24, 2017) (rejecting the Commissioner's suggestion that the court may "consider only the ALJ's RFC explanation and disregard [her] step-three findings" and explaining the facial inconsistency between a step-three finding of "moderate" limitations maintaining concentration, persistence or pace, and an RFC finding that merely restricts the claimant to "simple and repetitive tasks"), *adopted by* 2017 WL 598504, at *1 (W.D. Va. Feb. 14, 2017).

As the Fourth Circuit has stated, there will be cases where a restriction to simple, routine tasks or unskilled work reasonably accommodates a claimant's "moderate" difficulties or limitations maintaining concentration, persistence, or pace—especially where there is credible medical evidence that the claimant could "show *sustained attention* to perform simple repetitive tasks" or "maintain attention . . . as needed to do . . . basic, routine tasks *on a sustained basis*."

*Sizemore v. Berryhill*, 878 F.3d 72, 81 (4th Cir. 2017) (brackets and quotation marks omitted) (rejecting a *Mascio*-type challenge where the ALJ cited such evidence in "finding that, despite Sizemore's overall difficulties with concentration, persistence, or pace, he would nonetheless be able to *stay on task* while performing 'simple one, two-step tasks,' as long as he was 'working in low stress non-production jobs with no public contact'"). But the ALJ must explain, citing relevant evidence from the record, how restricting the claimant to such tasks accounts for her actual limitations in maintaining concentration, persistence, or pace. *See id*.; *Mascio*, 780 F.3d at 637–38. This is so because a claimant who can perform simple or straight-forward tasks may not be able to maintain sufficient concentration to sustain those activities consistently over a regular workday or workweek. *Mascio*, 780 F.3d at 638. Similarly, restricting a claimant's social interaction in the workplace does not necessarily address any difficulties the claimant may have focusing, staying on task, or maintaining a consistent pace, especially where the ALJ also found the claimant has "moderate" difficulties with social functioning. *Pittman v. Comm'r of Soc. Sec.*, No. 4:16cv18, 2017 WL 3836100, at *5–6 (W.D. Va. Aug. 15, 2017), *adopted by* 2017 WL 3821689, at *1 (W.D. Va. Aug. 31, 2017); *see also Bradley*, 2017 WL 4707035, at *3–4.

The Commissioner responds that ALJ Munday's initial summary of the evidence—particularly her step-three discussion of Yates's subjective statements and subsequent evaluation of the DDS psychologists' opinions—provided an adequate explanation for "why, based on the record, she arrived at the specific concentration, persistence, or pace limitations constituting her RFC." *See* Def.'s Br. 18–19 (citing R. 20, 22–31). I disagree. First, ALJ Munday specifically cited Yates's assertion "that she could pay attention for 30 minutes at a time" and "did not finish what she started" to support the step-three finding that Yates had moderate difficulties maintaining concentration and persistence. R. 20; *see* Def.'s Br. 19. The Commissioner does not

25

explain how this same evidence compels the conclusion that such moderate difficulties "do not affect [her] ability to work," *Mascio*, 780 F.3d at 638, or that Yates nonetheless could sustain the attention needed to "stay on task while performing" simple routine tasks, *Sizemore*, 878 F.3d at 81 (emphasis omitted). *See* Def.'s Br. 17–19; *cf. Claiborne v. Comm'r*, No. SAG-14-1918, 2015 WL 2062184, at *4 (D. Md. May 1, 2015) (stating that the ALJ's findings at step three should represent a well-reasoned consideration of the evidence and "are not simply an opportunity to give the claimant the benefit of the doubt at one step while taking it away at the next step").

Second, the Commissioner does not identify which "specific" limitations in the RFC correspond to ALJ Munday's step-three finding that Yates had moderate difficulties maintaining concentration and persistence. Def.'s Br. 18–19. Further, where the ALJ makes facially inconsistent findings as to a claimant's functional abilities or limitations, it is not enough to say that the record, even if adequately summarized in the ALJ's written decision, provides substantial evidence to support the RFC determination absent some reasonable explanation reconciling the ALJ's inconsistent findings. *Cf. Monroe*, 826 F.3d at 189 (explaining that it is not enough for the ALJ to "cite[] evidence that he appeared to believe tended to discredit" the claimant's testimony if he still "failed to 'build an accurate and logical bridge from the evidence to his conclusion' that [her] testimony was not credible" (quoting *Clifford*, 227 F.3d at 872)). Given that no such explanation is "apparent from the ALJ's decision itself," this Court "may not create or adopt post-hoc rationalizations to support" her RFC determination. *McGuinness v. Colvin*, Civil No. TMD 13-1573, 2014 WL 4854857, at *10 (D. Md. Sept. 29, 2014) (quoting *Haga v. Astrue*, 482 F.3d 1205, 1207–08 (10th Cir. 2007)).

Finally, although the Commissioner correctly points out that Dr. Leizer concluded Yates could perform simple, repetitive tasks "on a consistent basis," Def.'s Br. 15; R. 79, 92, ALJ

Munday did not mention that aspect of Dr. Leizer's opinion in explaining why she afforded his assessment only "partial weight." R. 29. She also gave "greater weight" to Dr. Insinna's assessment, R. 30, which did not explicitly address whether Yates's overall moderate difficulties with concentration, persistence, or pace nonetheless would allow her to maintain the attention necessary to perform simple, "routine tasks on a sustained basis," *Sizemore*, 878 F.3d at 81 (emphasis omitted). R. 30, 106–07, 119–20. On the contrary, Dr. Insinna cited Dr. Cousins's conclusion that Yates "would have moderate difficulty . . . performing work activities on a consistent basis" to support her opinions that Yates had "moderate" limitations in specific "sustained concentration and persistence" capacities, including her ability to maintain attention and concentration for extended periods and to complete activities within a schedule. R. 107, 119. This Court cannot disregard the differing weights ALJ Munday assigned Dr. Leizer's and Dr. Insinna's opinions simply because the opposite choice might have supported a denial of benefits. *See McGuinness*, 2014 WL 4854857, at *10; *cf. Dunn v. Colvin*, 607 F. App'x 264, 271 (4th Cir. 2015) ("We must defer to the ALJ's assignments of weight unless they are not supported by substantial evidence.").

ALJ Munday compounded her error when she failed to mention Dr. Insinna's specific opinions about Yates's concentration, persistence, or pace limitations in her summary of the medical evidence. R. 30; *cf. Bradley*, 2017 WL 4707035, at *3 (rejecting the Commissioner's argument that the ALJ properly relied on a DDS psychiatrist's conclusion that Bradley "retained the specific ability to complete simple, routine work tasks" where the psychiatrist's RFC assessment also reflected his finding that Bradley "exhibited pronounced difficulties concentrating" during a psychological evaluation (citing *Mascio*, 780 F.3d at 638)). Even assuming ALJ Munday considered those limitations, *see Reid*, 769 F.3d at 865, the "ALJ may

not select and discuss only th[e] evidence that favors [her] ultimate conclusion, but must articulate, at some minimum level, [her] analysis of the evidence to allow the appellate court to trace the path of [her] reasoning," *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995). Here, it is not clear whether ALJ Munday rejected Dr. Insinna's more specific findings and restrictions while crediting her ultimate conclusion that Yates could perform "one- or two-step gainful tasks," R. 108, 120, or whether ALJ Munday thought that limiting Yates to simple, routine tasks with some restrictions on social interaction accounted for Dr. Insinna's opinions that Yates had moderate limitations maintaining attention and concentration for extended periods and completing tasks within a schedule. *See* R. 30. *Compare Davis v. Colvin*, No. 4:13cv35, 2014 WL 3890495, at *1, *12–13 (W.D. Va. Aug. 7, 2014) (reversing and remanding where the ALJ committed the same error), *with Sizemore*, 878 F.3d at 80–81 (rejecting the argument that remand was required "because the ALJ failed to accommodate" the DDS psychologist's findings that Sizemore was "moderately limited" in his ability to perform activities within a schedule where the ALJ properly relied on the psychologist's opinion that Sizemore "nonetheless would generally be able to maintain attention for at least two hours at a time as needed to do simple, routine tasks . . . on a sustained basis" (emphasis, brackets, and quotation marks omitted)). "In light of Dr. [Insinna's] *entire* opinion, the ALJ's error falls squarely in line with the Fourth Circuit's conclusion in *Mascio*: 'the ability to perform simple tasks differs from the ability to stay on task.'" *Bradley*, 2017 WL 4707035, at *3 (quoting *Mascio*, 780 F.3d at 638)). The Commissioner should have an opportunity to consider that error and adequately explain her RFC determination on remand. *Bradley*, 2017 WL 4707035, at *3–4.

IV. Conclusion

28

For the foregoing reasons, I respectfully recommend that the presiding District Judge **GRANT** Yates's Motion for Summary Judgment, ECF No. 15, **DENY** the Commissioner's Motion for Summary Judgment, ECF No. 18, **REVERSE** the Commissioner's final decision, **REMAND** the case for further proceedings under the fourth sentence of 42 U.S.C. § 405(g), and **DISMISS** this case from the Court's active docket.

### Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the Honorable Jackson L. Kiser, Senior United States District Judge.

The Clerk shall send certified copies of this Report and Recommendation to all counsel of record.

ENTER: February 16, 2018

Joel C. Hoppe
United States Magistrate Judge